This case for the morning is Wite Monkee Productions v. Netflix, counsel for appellant. If you would make your appearance and proceed, please. Good morning, and may it please the court, Gregory Keenan, appearing on behalf of appellants Tim Seppi and Wite Monkee Productions. I'd like to reserve three minutes if I may. In 1990, Judge LaValle penned a landmark law review article introducing and popularizing the notion of transformative use. After that, the concept quickly spread and suddenly took center stage in copyright. Just four years later, in the Supreme Court decision of Campbell, the Supreme Court adopted this notion of transformative use, noting that a parody, a rap parody of Roy Orbison's famous song, Pretty Woman, constituted a transformative use, thereby affecting the first factor in a way that weighed in favor of a finding of fair use. Following that, there were two decades of growth of this concept and radical expansion, particularly in the Second and the Ninth Circuits, and particularly in cases involving new technologies, implicating Internet uses of copyrighted works. But by 2015, the Second Circuit flagged a concern. Transformative use, the doctrine, had been misapplied and had been growing too broad. In fact, it was Judge LaValle himself, the very architect of the notion, who made a very important observation. He noted that the word transformative, if interpreted too broadly, can seem to authorize copying that should properly fall within the scope of the author's derivative rights. And recently, the Second Circuit expanded upon that concern and that point in its Warhol decision. It noted that, importantly, transformative use is susceptible to misapplication and can be interpreted too broadly, and that one must bear in mind that transformative is, quote, a legal term of art that does not express the simple ideas that it carries in ordinary usage. As such, it said that clarification was in order. And in just the past three years, both the Ninth Circuit and the Second Circuit have issued such clarifications to rein in the overexpansive scope of transformative use. That would be in the Ninth Circuit's Dr. Seuss case and the Second Circuit's Warhol case. Importantly, and critically here, a clarification that was shared by the Second and the Ninth Circuit was that, as the Ninth Circuit explained in Dr. Seuss, the addition of new expression to existing work is not a get-out-of-jail-free card that renders the use of the original transformative. In doing so, it rejected a transformative use that rested solely on the fact that there was extensive new content added to the underlying work. And the Second Circuit Warhol made similar clarifications. It rejected the view that, quote, any secondary work that adds a new aesthetic or new expression to the original source material is necessarily transformative. And it pointed back to the original Supreme Court decision of Campbell for basis for this concern and for this restriction. It noted that there exists an entire class of secondary works that, even though they add new expression, new meaning, and new messages, nevertheless may not qualify as a fair use under transformative use. And those works were the derivative works, the exclusive derivative rights that a copyright owner has in their work to make new and transforming uses. And notably, I think it's important here, the Second Circuit in its Warhol decision points back to both Harper and Campbell from the Supreme Court to center its concern about overexpansiveness of transformative use on these derivative rights and for the fourth factor of fair use for an assessment of the derivative market. The problem with the order below and the problem with our opponent's position is that it simply doesn't account for this most recent clarification of what transformative use means. They rely on cases going right up until 2013 to explain what transformative means. But in 2015 and in the past three years, there's been an expression of concern and clarification about how to rein in the scope. Well, as an initial matter, we're not bound by what the Second Circuit and Ninth Circuit said. We have Campbell, and Campbell is something that we've read and we understand. And so, I mean, that's not going to be determinative. I mean, we can look to that as a guide, and that may be helpful. But tell me, based upon your interpretation of those cases, those newer cases, I assume where you're going is that this was not a transformative use, and so why would that be the case? Yes, Your Honor, and I appreciate that. There's two different principles operating in Campbell that demonstrate that what happened here does not fit within the Campbell notion of transformative use. And leaving aside entirely the Second and Ninth Circuit, the two bases for this is both the statute itself in the 101 definition, Section 101 definition of derivative work, which uses the word transform, but also in Campbell, the Court noted that what happened there was that there was a direct commentary. There's a necessity to use the expression in that case in order to make a comment that didn't just add new things, but actually took the preexisting expression itself and transformed that. So it's not just that the person making use of it is doing something new. It's that both the preexisting material is essential to the thing that the second speaker is trying to say, but also that in the process of saying their thing, the second speaker is actually taking the work and the original expression and changing it, not just adding things around it or not just layering things on top of it. I understand that, but one thing that Campbell seemed to stress is it was dealing with the parody. Yes. And it was dealing with that in some sense as a subset of this broader issue. It is a distinct art form, and nobody's claiming this is a parody. And so you've got 66 seconds, I think it's something like that, out of this 24-minute clip that is popped into, and that 24-minute clip was designed to talk about remembrance, remembrance at the funeral. Well, I don't think there, well, I find it hard, maybe you'll disabuse me of the notion, to suggest that remembrance was the focus in the Tiger King of that 66 seconds, was it? No, Your Honor, but I don't think that's germane to the Campbell analysis. Well, okay, then help me with that and be clear now. My initial point was Campbell can be only taken so far because it dealt with a unique art form. Nobody's saying this is a parody. Okay, now why is it not germane? Yes, Your Honor, so Campbell does deal explicitly with parody, and that's only one subset of things that are transformative. But the other things that are transformative are found in the preamble of 107. So I guess the problem is if we're only looking at Campbell and we're only looking at the statute and we're only looking at the transformative uses out there as discussed and clarified by the Second Ninth Circuit, sentence use of just adding a voiceover doesn't satisfy the transformative use in the sense of that term of our means because it's not changing the underlying expression. It's not doing anything to Mr. Seppi's expression. So it's taking that and using it as a raw material and then adding things around it and on top of it, but that's never been understood to be within the ambit of transformative use. But even leaving that aside, the biggest problem here is probably the effect this had on the fourth factor because what the court was supposed to do is to look at the potential markets, and the Supreme Court in both Campbell and Harper stressed that that requires a look at the derivative rights markets. So there's two problems. One, defendants say, and the court said, there's just no market for licensing uses of this work. But defendants themselves argue that they paid licenses to other people for other clips that they use in Tiger King, so there is a license for it. There's a license in this very case. They just decided not to offer Mr. Seppi a license for use of his work. Secondly, there was just no examination whatsoever of the derivative rights market. Did the defendants present any evidence in the record of the impact on a derivative rights market? Not to my knowledge. I couldn't find any, and the only evidence they introduced about the original rights market was the fact that they themselves were licensing works, which weighs against the finding of fair use here. I'd also like to just look at the second factor because leaving aside all the previous stuff about transformative, the district court made two errors just blatantly misinterpreting and misapplying two terms of art. So it found that the work that was taken, Mr. Seppi's funeral film, was both factual and published, which if true would weigh in favor of fair use. The problem is the court just misinterpreted what those mean. So the Fourth Circuit recently, in a case called Brammer, said that photography and videography are generally viewed as creative and aesthetic expressions, even though they may be capturing reality in some sense. In copyright, when you're saying factual, what you're looking at is something the Supreme Court discussed in the Feist case, which is a raw data compilation of preexisting facts. They're then compiled into just a database. But photography and videos, for the entirety of their time in treatment in copyright law, has always been treated as creative. As a general matter, that's true. But in this case, Mr. Seppi set up the camera. That's all he did, right? Yes, Your Honor. And he let it roll. But in the Brammer case, all that was done was someone walked outside and took a street photo of a street in Washington, D.C. Well, a street photo from a particular angle, from a particular light, all of those things come into play when you're taking photographs. But there's no indication that any of that happened beyond setting up the tripod, right? Yes, Your Honor. But I would just implore you to look at the Feist decision by the Supreme Court, which discusses what even that very simple decision means for originality and creativity in copyright. All right. Then let's move on to the publication point. Yes, Your Honor. He put it on the Internet. It was on YouTube, right? It was streamed live. It ends up on YouTube. I assume it's still there. Absolutely, Your Honor. Then how in the world is that not publication? Sure. I would advise the Court to look at the 11th Circuit's decision in Martin Luther King, Jr. v. CBS, which the famous I've had a dream speech, which we've all seen. While every one of us would say it's obviously been published, we've all watched it. It implored courts to realize that this is a term of art. In publication, it's a very complicated history. It goes back to the 1909 Act and the interactions of federal copyright and state copyright. Publication is a really precise term, and it's also currently codified in the 1976 Act, section 101. The definition expressly says that mere public availability or public displays is not publication. What publication means in copyright, and it's a counterintuitive term, is you have to take a physical copy and make that physical copy available. So putting up a public performance on YouTube, even though it's immensely pervasive, just doesn't fit the very specific term of art that publication means in copyright. And physical copy meaning that you walk the physical copy to somebody? In this day and age, that's what publication has to mean? Meaning the distinction that's drawn in the statute between copies and works. I'm focusing now on the question of publication. You're letting me believe that there is a narrow definition, and it means that you have to provide a physical copy. And what I'm saying is, are you telling me that in 2023, in order to publish something, I have to hand you a disc? You wouldn't have to hand me a disc. You'd have to introduce a disc. You've relinquished control of the disc and get put into the stream of commerce. Well, he relinquished the control of the 24 minutes by putting it on YouTube, did he not? Not within the meaning of publication as defined by the statute, no. Just look at the definition of publication under section 101, which expressly makes this point. What if he put it on someone else's, if it's not his YouTube channel? What if he puts it on my YouTube channel? No, Your Honor. It's still his? I know it's incredibly counterintuitive. Our brief covered the portions of copyright treatises that deal with the 100-year history of this. The 11th Circuit has said that's a very specific term of art that is counterintuitive, and the statute at section 101 expressly allays this kind of very intuitive concern. I agree with you. It does seem like it should be published. What if he sent everyone in an organization a YouTube link and said, hey, go watch this? I understand the question and I understand the intuition. I would just say as that term of art has been consistently applied and as recently as the 21st century by the 11th Circuit, this term has always meant something about relinquishing physical copies. And so the mere, again, the statute itself will say merely making it publicly available. We've been streaming it very broadly. Okay. Let me ask you one question about the way you analyze the factors. So you've got to consider all the factors together. You agree with that? Yes, Your Honor. And so the mere fact that one factor might not weigh in favor of fair use isn't dispositive? Absolutely. Does the other factors weigh in favor, outweigh it? Absolutely. But I would just stress that the misapplication of transformative affected both the first and the fourth factor, and then the third factor was misapplied, or sorry, the second factor, because there were two different specific legal terms of art that were misapplied. So at the very least, we have an error. We would submit on three of the four factors. So what do you think about, I hate to admit that I might watch YouTube sometimes, not this particular item, but what do you think about reaction videos where I take a piece of your video and I react to it, and I play yours on mine without permission and I react? Can I answer? I see that my time is up. Yes, of course. Yeah, I think that's a great concern. It's actually probably one of the most prominent transformative uses on the Internet at the moment. Part of what that's doing is I do think that is fitting the more traditional notion in the preamble of book commentaries, where you're taking an excerpt of a book. You're not using it for the purpose of the narrative. You're using it for the purpose of making a comment or reaction. So I think that very important new use fits very neatly into a very long line of precedent. That's right up in the preamble is book reviewers and it's just a 21st century iteration of it. May I? Of course. On the fourth factor, what is the relevance of the fact that your client had never sought to distribute anything, had never been in the business of licensing his works? Isn't there some authority that that would preclude a claim on the fourth factor? My answer would be no. I'm not aware of that authority. And we, in our brief, touched on authority to the contrary, which was because it talks about the potential market. The fact that the artist hasn't themselves gone out and tried to license it yet doesn't affect it. And it's because the Supreme Court stresses you have to look at what the pervasive effect of this type would be on this market generally. So if everyone did what Netflix did here, would there be this type of market for people in this receptive position? The other question I have is do you think that the Supreme Court's upcoming decision in Warhol would have any effect on our analysis here? It would be hard to venture a perfect guess. I would say no if you look at the precise question that's been certified, because it has to do with something that I don't think in play here. But to the degree that they speak about the need for clarification or reining in transformative use in some sort of dictum beyond the certified question, then perhaps. Which is a possibility given that Campbell, in your view, has been superseded in some ways or transformed in some ways by later decisions of the circuit courts. Maybe I misunderstood. Just to clarify, I think Campbell was the proper scope, has always been the proper scope, and Netflix's use here just exceeds it. And so the Second and the Ninth Circuit said a whole bunch of cases that everyone relied on that have gone beyond Campbell. But recently, the Ninth Circuit and the Second Circuit are walking it back and it's getting closer back to what Campbell originally said. Thank you. Thank you very much. Thank you. Good morning, Your Honors. Robert Rothstein, appearing in front of the appellees. May it please the Court. One thing my colleague didn't talk about is the district court's order granting summary judgment on seven of the eight videos on the grounds that these videos were works made for hire under the Copyright Act because they were filmed within the scope of Mr. Seppi's employment. So I'd like to address that first. And the district court's opinion was decided against the following backdrop. In 2016, Mr. Seppi testified without hesitation, with really no ax to grind, that he was hired to be a videographer both for Joe Exotic TV and for other park activities, also to take still photos, all for $150 per week, all in. Four years elapse and 2020, Tiger King comes out, very popular. And suddenly, Mr. Seppi brings a lawsuit and does a 180. He said, I was only hired to be a still photographer for park tours. And when he was confronted with the contradiction between 2016 and what he testified in 2020, his response was, well, I'm a perjurer. Very straightforward decision on seven of the eight videos, they were works made for hire. So counsel, he's really not pursuing those claims. Do you think you don't need your time to go over the final copy that was made after he was employed? If you don't, if you'd like me to focus on, sure. I think you may want to. I know my friend didn't mention those claims, but they still argued them in the brief. But I will move on to fair use. And I will say just sort of generally, the transformative still stands. In just a couple of years ago, in Google versus Oracle, the Supreme Court applied transformative standard to computer software that didn't comment, you know, a very broad application of the transformative standard by the U.S. Supreme Court recently. So the idea that the traditional types of fair uses, transformative uses, as in this case, have been cut back is not accurate. Certainly, there are four factors. The court goes through the four factors test. The first one is the purpose and character of the use. And the most important aspect of that first factor is whether or not the work is transformative. And here this, Tiger King was, the use actually of the funeral video was highly transformative for several reasons. One, there was physical transformation. Voice overs, cuts, interstitial material interviews. And that changed the work physically. But there was more than that. There was something that, you know, might be called microtransformation. And it was really classic Campbell versus Acuff-Rose, as Judge Holmes said. The message and meaning of the clip was changed. Mr. Sebi testified that the issue was remembrance. He filmed and he wanted to remember his friend who died tragically. The purpose, the meaning of those clips in Tiger King is that Joe Exotic is disingenuous. He's a performer, even when he's supposed to be eulogizing his spouse. And that's classic. What Campbell versus Acuff-Rose says is that transformative use changes the meaning and message of the original. And that's exactly what happened. And then there's a third level, maybe more of a macro transformation that the cases recognize. And that is that the funeral video was used as raw material to create a different work, a different type of work. And that is the Tiger King documentary. The Tiger King documentary is not a competing funeral video. It's a new work. And cases like the Bill Graham Archives case talk about using the work as raw material. So on three levels, this is highly transformative and more transformative than many of the cases that we cite. So that's the first factor. I will say in their brief they talk about commerciality, but given the highly transformative use, commerciality doesn't really matter much. Campbell versus Acuff-Rose involved commercial use, as did Google versus Oracle. Billions of dollars at issue in Google versus Oracle, and yet the first factor still weighed in favor of fair use. On that point, my recollection was the district court found that it was not commercial use, and I haven't seen any indication in your brief that you defend that conclusion. I think I do not defend that. We do not defend that conclusion. I didn't read, Your Honor, the district court's statement that way. I read the district court's statement as saying they didn't use the funeral video to promote somehow through commercial. There wasn't on the cover saying, you know, see the funeral video. There are cases, the Ninth Circuit case, Elvis Presley Enterprises versus Passport, where they find it's more commercial because a long, long clip of Elvis was touted on the cover of the CD. So I didn't read that. But you're not arguing that this was non-commercial? We are not arguing it's non-commercial. Certainly it's a commercial use, but under Campbell versus Acofros and Google versus Oracle and the lower court decision, it doesn't matter. I don't even know if we cited the case finding fair use that didn't involve a commercial use. Well, looking at Andy Warhol and to some extent, I guess Campbell, the raw material prong of this, the third one that you listed, generally, at least based upon my recollection of Andy Warhol, we're talking about taking stuff and basically transforming it in a way that would be, and that was not the case in Andy Warhol, but they were contrasting those cases where raw material was found. And in those cases, you barely would recognize it. It was something that was sort of submerged into some creative vision. That's not what's happening here. You would recognize that clip in the context of the Tiger King video. So why would the raw material line of cases actually work here? Well, there's a different line of raw material cases. Bill Graham Archives is a case where, a Second Circuit case, where the defendant used a book about the Grateful Dead and they used Grateful Dead posters, completely recognizable, completely copied as historical artifacts. It's the raw material to create the book. I think, I believe Bill Graham uses that term. In the Ninth Circuit, the Seltzer versus Green Day case was a rock concert, and the defendants in the beginning took some street art and put it in a montage. And the Ninth Circuit, again, held that that was raw material. Another Ninth Circuit case, and I'll stop, SOFA Enterprise, I think it was the Four Seasons, they used a clip from, maybe not the Four Seasons, I can't remember the act, but they used a clip from Ed Sullivan at the beginning. Clearly recognizable, but raw material for the play. So there's a different line. Judge, I think you're talking about the Blanche v. Coons case, I think, where that was artwork, they took the legs and different, but there are a line of ideas where you take work and you make a, you take a piece of a work, copyrighted work, you use a small portion of it and you make a new, different kind of work. And that's what I meant by raw material here. Okay, thank you for that clarification. Let me jump ahead to the fourth factor, and you may end up getting to go back to the third. But on the fourth factor, in your brief you state that the, quote, fourth factor weighs in defendants' favor when plaintiff provides no evidence demonstrating a marked impact, unquote. That's not really the test, is it? I mean, this is an affirmative defense, and Campbell makes clear that's your burden, not the plaintiff's. And I agree that the burden is on us on various, on the fourth factor. And we met that burden by, as follows. There are really two aspects. And, by the way, I will mention that there are cases, the Happy Trust case we Googled, which indicates that notwithstanding that the burden is on us, the plaintiff has some burden of showing that there are markets. It's Happy Trust we Googled. There's a, in the Second Circuit Andy Warhol, I think it's footnote 10 or 11, it talks about, you know, there's sort of a burden within the burden. So I, because it's subject to proven equity. That being said, either way, we met that burden because we asked Mr. Seppi about markets. Now, there are two possible markets. There's a market or potential market for the original, the funeral video. And there are cases saying that these little snippets could not possibly dissuade anybody from wanting to purchase the funeral video. They're just, it's not a substitute. So that's the first aspect of market harm potential. Is there damage to an existing or potential market for the original? And that's, and that is the only portion that the district court seemed to focus on, which was the substitute line saying that this was not a substitute. Well, I, there's a de novo review, and I'd have to go back and look. But I thought that the district court talked about derivative markets. And that's the second aspect. One does, a court does look at the potential derivative markets. But Campbell, and especially the Bill Graham Archives case, point out that when you're looking at derivative markets, it's got to be non-transformative derivative markets. In other words, you can't, you can't, the two life cases out there say, you can't start selling licensing parodies and say, hey, I got a market for parodies, so my market's harmed if someone makes a fair use parody. And here, Mr. Seppi, you know, we asked him, could identify. I think as a matter of law, it's hard to see what kind of non-transformative market that would be for the Travis Maldonado funeral video. Well, I'm, it's not abundantly clear to me that that's right. I mean, if you're talking about derivative markets, that you have shown one way in which that clip could be used, why couldn't there be other people out there that would want to license it to do similar, own creative stuff, using it as raw material for what they were doing? Why would that not be a derivative market for that? Because that is a transformative derivative market, and you don't look at that. Because if you did that, there would be no fair use. If you think about it, the, it would be circular. Everybody could say, well, you know, I wanted to, you know, I would have licensed that, and therefore it's a derivative market. The Bill Graham case, I think there's another case cited in Carroll Publications, says that you do not look at a transformative derivative market. Otherwise, you would read fair use out of the statute, because the plaintiff could always say, I would have licensed that. Well, there could have been a derivative market. I mean, why couldn't somebody use it for something that was non-transformative, but nevertheless they could have seen that there was value in it? But more to the point, Campbell speaks of evidence. It doesn't speak of case law. It doesn't speak of analogies. It speaks of evidence. What evidence beyond the words out of Mr. Seppi's mouth did you put in the record that goes to derivative use, impact on derivative market? Well, we did not, but I think that's why cases like Half the Trust and another case, Paramount v. Leibovitz, and again it's sort of described in footnote 10 or 11 of the Second Circuit Warhol case, put a burden, some burden on the plaintiff to show that there are markets. I understand the overall burden of proof is on us, but it's proving a negative. I couldn't begin to describe how we could come in and say there are no markets when Mr. Seppi says no markets. I mean, I don't mean to be, well, it's a funeral video, so I was going to give an example. I guess I will because I can't think of another. I mean, you couldn't have a derivative market for T-shirts, I don't believe. I could start making things up and looking at what studios and copyright holders do for derivative markets. You couldn't have a derivative market for T-shirts relative to the funeral video? Correct. And why not? Well, and I don't think, even if you did. Given the popularity of Tiger King and given the fact that Mr. Mazzonato's passage appears in the funeral video, why in the world could you not have T-shirts with that funeral scene? Okay, if you could, then the use that Tiger King made of the video would not harm that market. Of course. No one is, as a matter of law, you're, I'm sorry. No, I'm sorry. Go ahead. As a matter of law, let's take the T-shirt hypothetical. As a matter of law, no one would forego buying a T-shirt because those clips appear in Tiger King, and that's the test. And that's why we've met our burden. But is the test not just what occurred in Tiger King, but if there are other people who do this sort of transformative use, could they impact that derivative market? Isn't that the test? Well, it is not. Okay. The test is only if other people do a non-transformative use. Okay. Because everybody else who would do this transformative use presumably would be making fair use of it. Now, someone, you know, I guess there are transformative. I know of no case really that finds a highly transformative use like that, that ever finds, you know, that ever finds the lack of fair use. So I can't think of any kind of market harm that would overcome the transformative use. Okay. All right. Then let me be clear to make sure I understand the law. You're telling me, at least I thought I recalled reading in the cases, that the danger we're also concerned about is whether if other people do what the defendant did, will that have a downstream impact on the derivative market for the copyrighted work? Is that not the law? That is the law with the important exception that derivative, I'm sorry, transformative derivative uses don't count. And, again, the example that Two Life Crew or I think Bill Graham, other cases use, one cannot go out in the market and start licensing parodies and then say, oh, this parody violates my copyright and I have a market for it. It's only, that test only applies to non-transformative derivative uses. And, again, I believe it's Bill Graham Archives that makes that point. Thank you, counsel. I'm sorry I went over time. Do you think we would learn anything relevant to this case from the Supreme Court decision that's upcoming in the next few months in the Andy Warhol matter? I believe that it would not change the decision that this is fair use. However, the issue is transformative use. So, candidly, the issue in the Warhol is how you define transformative use. So it might frame the discussion. Candidly, it's going to be deciding to some extent what transformative use is and means. It's not going to get rid of entirely. We still have Google versus Oracle out there. Thank you, Your Honor. Did you have any remaining time? Did you expire? Was your time expired? I think it ran over. Well, because he ran over, if you want two minutes, you have it. Thank you. Thank you very much, Your Honor. I would just point to Campbell. Even though the court in Campbell found that it was transformative, they still remanded it for fact-finding as to the fourth factor, particularly out of concern for if there wasn't enough facts into the effects on a potential derivative market. So just because something might be transformative, that doesn't get rid of the obligation to look at the effects on potential derivative markets. Could we assume that there was an effect on a potential derivative market here, but if we concluded that the other three factors weighed against you, decide the case on that basis? Yes, Your Honor. I think you have to reach a conclusion on each of them and then weigh them together. So there's no perfect formula. Also, I just want to note that my opponent correctly notes that both Google and Campbell from the Supreme Court involved highly commercial uses and were still transformative. But if you look at those cases, in both situations, the infringer initially had tried to license and work out negotiations ahead of time. And in Campbell in particular, two live crew offered both money and attribution to Ray Orbison for the necessary use of his work. And that goes to the heart of what's fair. Here, they didn't give him attribution. Here, they didn't offer him a license while they're giving licenses to other people for clips and the inclusion of the same film. So there's an original market that's already in the record. They're just not treating Mr. Seppi with the same courtesy of trying to license the use of his work. They're not doing what the defendants in Campbell and Google did. And so, sure, commerciality does initiate fair use, but you still have to be fair about it. And the facts of the Supreme Court's case demonstrate infringement or fair users who had tried to actually work out deals and had tried to give attribution or negotiate a license. And that just is a glaringly absent… Well, I thought in Campbell that fact ended up being irrelevant. The court deemed it irrelevant. It said it didn't matter. I mean, that's not relevant to the legal analysis, whether they were trying to be good guys and offer them money. In… Campbell. Yes, in Campbell, it wasn't centrally featured in the analysis, but at least in Google, Justice Breyer did say it remains an open question as to whether or not being a quote-unquote good guy weighs in favor of fair use. Chief, can I ask you a question real fast? Of course. Do you agree that when you're looking at the evidence of a relevant market, that the market you have to look for is the non-transformative derivative market? I think that would be an overstatement, but my colleague is correct that in a parity context, you can't look to the parity derivative market, specifically for unique concerns about parity criticizing. But it wouldn't go so broad as to say you don't look at the non-transformative. I don't think that's compatible with what Campbell did. I mean, if you… I mean, doesn't it make some sense, though, that if you start looking at the transformative derivative market, then fair use doesn't exist, at least as far as Factor IV is concerned? There's absolutely a tension between the two. Where you draw that line, I think, is an open question. Okay. Thank you. Thank you very much. Fine arguments. Case is submitted.